This was an indictment for blasphemy, and charged that Thomas J. Chandler, on the tenth day of May, in the year of our Lord 1836, with force and arms not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, and contriving and intending to scandalize and vilify the Christian religion and toblaspheme God and our Lord Jesus Christ the Savior of the world,unlawfully, wickedly, and blasphemously in the presence and hearing of divers citizens of this state spoke, pronounced and with a loud voice published these profane and blasphemous words, viz: that the virgin Mary was a whore and Jesus Christ was a bastard;
to the great dishonor of Almighty God, in contempt and to the great scandal of the Christian religion, against the form of an act of the general assembly in such case made and provided, and against the peace and dignity of the state.
On the trial before the jury,
M'Beth, of counsel for the defendant, relied mainly on the alledged *Page 554 
unconstitutionality of the statute against blasphemy, as being law preferring Christianity to other modes of worship. He also cited Mr. Jefferson's letter to major Cartwright, from the fourth volume ofJefferson's Memoirs, page 396; American Quarterly Review for June, 1835, page 319-20; to prove that Christianity was no part of the law of the land.
W. II. Rogers, deputy attorney general, replied for the state. The jury found a general verdict of guilty.
Another indictment against the same defendant was then tried, for blasphemy in uttering the words "that Jesus Christ was a bastard andhis mother was a whore." With this difference in the words and their arrangement, this indictment was precisely like the former. The jury in this case found a verdict of guilty in manner and form as he stands indicted "except as to the intent to blaspheme God."
After verdict the defendant's counsel moved in arrest of judgment in each case; and the question of the constitutionality of the statute against blasphemy was again discussed by Rogers, deputy attorney general, for the state, and by M'Beth, for the defendant. The defendant's counsel also urged, that no judgment could be rendered in the last case tried, because the jury had not found the "intent to blaspheme God."
The Court held both eases under advisement until November term, 1837, when the following opinion was delivered, by the chief justice.
The questions arising out of these records are — First, whether the offence charged in these indictments is within the purview of the statute of this state against blasphemy, passed on the 8th Feb. 1826; and secondly, whether that statute be inconsistent with the state constitution.
The act of the 8th of February, 1826, directs, that "If any person shall be guilty of the crime of blasphemy, every person so offending upon conviction thereof, shall forfeit and pay to the state a fine not exceeding fifty dollars, and shall suffer imprisonment in solitary confinement for any term not exceeding two months, and may, in the discretion of the court, be required to find sureties for good behaviour for one year after discharge from prison."
This is a part of the general statute providing for the punishment of crimes and misdemeanors. It does not define the crime of blasphemy; nor does it define treason, murder, rape, perjury, sodomy and many other crimes, for the punishment of which it specially provides, as it does for that of blasphemy. We go for the legal definition of each of these crimes to the common law, and to that we must apply for the legal definition of the crime charged in each of these *Page 555 
indictments. The legislature, using technical legal terms to describe the offences they intended to punish, had reference of course to the meaning of those terms as understood and defined in the only books which contain any legal definition of them, which we can notice; and those books are the works of the common law writers on crimes and misdemeanors. These authorities do not leave room for any doubt on the question whether the words charged in these indictments and found by the several verdicts upon them, to have been pronounced in manner and form as there alledged, do constitute the crime of blasphemy.
It appears to have been long perfectly settled by the common law, that blasphemy against the Deity in general, or a malicious and wanton attack against the Christian religion individually, for the purpose of exposing its doctrines to contempt and ridicule, is indictable and punishable as a temporal offence. The cases of The King vs. Taylor,Vent. 293, 3 Keble's Rep. 607; of Clendon Hall, E. T. 10 Ann, citedStr. 789, H. T. 79, Str. 416; The King vs. Woolston, in Str. 834,Fitzg. 64, 66, Barnard. 162; The King vs. Williams, "before Lord Kenyon, C. J., at Guildhall, 1797, 3 B. A. 161; Att'y. Gen'l. vs. Pearson,
3 Meriv. 352; The King vs. Waddington, 1 B C. 26; with the criminal informations against Jacob I live, Peter Annett, JohnWilkes and Daniel Isaac Eaton, referred to in the elementary books of the common law, (See Stark, on Slander, 440-1, c.; Holt on Libel,
66; Russel on Crimes, 209, 217;) fully establish this principle. And it further appears that although a written publication of blasphemous words, thereby affording them a wider circulation, would undoubtedly be considered as an aggravation of the offence, and affect the measure of punishment, yet so far as respects the definition and legal character of the offence itself, it is immaterial whether the publication of such words be oral or written. They equally constitute the crime of blasphemy in either case. King vs. Atwood, Cro. J. 421, King vs. Taylor,
3 Keb. Rep. 607; Stark, on Slander, 441. In the case ofThe People vs. Buggies, 8 Johns. Rep. 291, Kent, C. J. delivered the opinion of the Supreme Court of the State of New York, that blasphemy against God and contumelious reproaches and profane ridicule of Christ or the Holy Scriptures, are offences punishable at common law, whether uttered by words or writing; and that wantonly, wickedly, and maliciously uttering the words "Jesus Christ was a bastard and his mother must be a whore "was a public offence, punishable by thecommon law of New York.
The Supreme Court of Pennsylvania in Updegraph vs. The Commonwealth,
(11 Serg. Rawle, 400-1,) which was the case of an indictment for blasphemy, have fully affirmed the principles of Euggles' *Page 556 
case, and have declared that, from the time of Bracton, Christianity was part of the common law of England." To the list of authorities already cited which sustain this opinion may be added,Tremaine's Pleas of the Crown, 226, Bex vs. Doyley, Emlyn's prefaceto the State Trials, 8; 2 State Trials, 273, Whitlock's Speech; Raym.
162; 4 Blac. Com. 59; 1 Hawk. b. 1 c. 5; 1 East's P. C. 3; 3 Burns. Ec. Law, 202; 1 St. Trials, 302. And in the case of theChamberlain of London vs. Allen Evans, Esq. in 1767, upon a writ of error to the house of lords (Blac. Com. appendix to Bell's edition, vol. 5, p. 145,) Lord Mansfield says, "The eternal principles of natural religion are part of the common law; the essential principles of revealed religion are part of the common law; so that
any person reviling, subverting, or ridiculing them, may be prosecuted at common law." This is the true meaning of the English maxim as usually applied. It was never pretended that the common law punished the violation of every precept of Christianity. No judge at common law ever decided, that he who did not to others as we would that they should do unto him, which is one of the most sublime of all the precepts of the author of that religion, or that he who did not repent and believe in Christianity, was therefore liable to a penalty, or punishment at common law. Indeed, in the very speech of Lord Mansfield already referred to, which was a noble and most successful effort in behalf of the dissenters, and the great cause of religious liberty, he says "there never was a single instance, from the Saxon times down to our own, in which a man was ever punished by the common law for erroneous opinions concerning rites, or modes of worship. The common law of England, which is only common reason or usage, knows of no prosecution for mere opinions. For atheism, blasphemy and reviling the Christian religion, there have been instances of persons prosecuted and punished upon the common law; but bare nonconformity to established rites and modes (of worship,) is no sin by the common law." The common law was, as Lord Coke expressed it in Sir William Herbert's case,
3 Rep. 42 b., "the preserver of the common peace of the land;"and, therefore, we find it punished outrages on, or breaches of the peace of society, and also acts whose tendency was to disturb that peace. The union between church and state in England, by which the Christian religion became connected with the government itself, induced a series of penal statutes to protect and prefer that religion as a part of the government itself. But even in England, Christianity was never considered as a part of the common law, so far as that for a violation of its injunctions, independent of the established laws of man, and without the sanction of any positive act of parliament made to enforce those injunctions, any man could *Page 557 
be drawn to answer in a common law court. It was a part of the common law "so far that any person reviling, subverting or ridiculing it might be prosecuted at common law," as lord Mansfield has declared; because, in the judgment of our English ancestors and their judicial tribunals, he who reviled, subverted or ridiculed Christianity, did an act which struck at the foundation of their civil society, and tended by its necessary consequences as they believed, to disturb that common peace of the land of which (as lord Coke had reported) the common law wasthe preserver. The common law never lighted the fires of Smithfield on the one hand, nor preferred the doctrines of infidelity, (which is proved by all history to be in character not less intolerant than fanatacism) on the other. It adapted itself to the religion of the country just so far as was necessary for the peace and safety of civil institutions; but it took cognizance of offences against God only, when by their inevitable effects, they became offences against man and his temporal security. It was never pretended by any common law court that he who did not "love his neighbor as himself;" or he who did not "visit the widow and the fatherless in their affliction, and keep himself unspotted from the world" was, therefore, indictable at common law. The same is equally true of the laws of God as revealed in the old testament. No lawyer ever framed an indictment in a common law court, charging that the defendant did not honor his father and mother, or merely coveted his neighbor's property. True, there are many instances in which the divine precepts have been enacted into statutes, and in case of a: violation of these, or of any divine mandate which had been adopted into the common law, because the peace and safety of civil society could not be secured without it, the common law courts became the avengers of the public wrong. And in all cases where the tendency of any man's acts or words was, in the judgment of a common law court, to disturb the common peace of the land of which it was the preserver and protector, or to lead to a breach of it and the good order of society, considered merely as a civil institution, the common Jaw avenged the wrong done to civil society alone. He, therefore, who subverted, reviled or ridiculed the religion of our English ancestors, was punished at common law, not for his offence against his God, but for his offence against man, whose peace and safety as they believed, was endangered by such conduct. Whether their belief in this respect was well or ill founded is not the question. To sustain the soundness of their opinion, their descendants point us to the tears and blood of revolutionary France during that reign of terror, when infidelity triumphed and the abrogation of the Christian faith was succeeded by the worship of the goddess of reason, and they aver that without this *Page 558 
religion no nation has ever yet continued free. They insist too, that all history demonstrates that no nation without the light of their common law, has ever been able to preserve any system of rational and well regulated liberty. But suppose all their opinions in these respects to be erroneous: still the question is not whether their law was well founded, but what was their law ?
The defendant's counsel, in the progress of the argument on this subject, referred to a letter written by Thomas Jefferson to major Cartwright, dated June 5, 1824, and published in the fourth volume of his posthumous works. This letter we notice, because respectable counsel have cited it. It is phrased in terms more becoming the newspaper paragraphs of the day, than the opinion of a grave jurist who feels respect for the memory of the eminent lawyers of England, because he knows and can appreciate their worth. The opinion of Lord Mansfield, who was one of the brightest luminaries of the common law, palpably misunderstood by this writer, is by him denounced as a "judicialforgery." He considers and so states, that by this maxim mentioned by Lord Mansfield, which recognizes revealed religion as a part of the common law, his lordship had. "engulphed bible, testament and all into the common law;" whereas, this mode of garbling a remark, and then replying to it, has done gross injustice to that great man, whose celebrated argument for religious toleration in the English house of lords in the case of Evans does by no means justify the imputation cast upon him. So far from meaning that bible and testament were parts of the common law for other purposes than that of punishing for the subversion, reviling or ridiculing them; so far from pretending that any man could be punished by the common law for mere infidelity, or for worshipping God as he pleases, or for any violation of any divine precept not expressly adopted by man as human law, which would make courts and juries the regulators of every man's conscience, Lord Mansfield expressly says "conscience is not controllable by human laws, nor amenable to human tribunals. Persecution, or attempts to force conscience, will never produce conviction; and are only calculated to make hypocrites or martyrs." "There is nothing," he adds, "more unreasonable, more inconsistent with the rights of human nature, more contrary to the spirit and precepts of the Christian religion, more iniquitous or unjust, more impolitic, than persecution. It is against natural religion, revealed religion, and sound policy."
Mr. Jefferson endeavors to show that the maxim that Christianity is a part of the common law of England is entirely derived from an opinion of Prisot in the Year Book 34, H. 6, folio 38, (145-8.) In a case quare impedit a question was made, how far the ecclesiastical *Page 559 
law was to be respected in a common law court. And Prisot gives his opinion in these words: "Prisot — a tiels Leys que ils de saint Eglise ont en auncient scripture covient pur nous a doner credence; car ceo est common Ley sur quels touts manner Leys sont fondues," c. (SeeFitz. abr. qu. im. 89. Bro. abr. qu. imp. 12.) The whole of Mr. Jefferson's complaints is, that Finch has mistaken this passage, by translating "auncient scripture" holy scripture. Mr. Jefferson translates Prisot's Norman French so as to make him decide "that to such laws of holy church as have warrant in ancient writing it is proper for us to give credence; "while, says he, Finch interprets the passage "to such laws of the church as have warrant in holy scripture
our law giveth credence." Now the question which the judge was considering when he delivered this opinion was, whether the sentence of the bishop or ecclesiastical court should have faith and credit at common law. He made the same decision which was afterwards made in the case reported in 11 II. 7, 9, and again in Caudrey's case, reported by Sir Edward Coke, 5 Rep. 1. In Caudrey's case "it was resolved by the whole court, that the sentence given by the bishop, by the consent of his colleagues, was such as the judges of the common law ought to allow to be given according to the ecclesiastical laws; for seeing their authority is to proceed and give sentence in ecclesiastical law, and they have given a sentence in a cause ecclesiastical upon their proceedings, by force of that law; thejudge of the common law ought to give faith and credit to theirsentence, and to allow it to be done according to the ecclesiasticallaw. For cuilibet in sua arte perito credendum est. And this, says Lord Coke, "is the common received opinion of all our books," for which he then cites the very case, 34 H. 6, 14, where the opinion is given by Prisot. The point decided was the legal principle that the sentence of a competent court of exclusive and peculiar jurisdiction is conclusive, where that sentence comes incidentally in question in another court. The judge, therefore, concluded that "if it could appear to us (the common law judges) that the bishop has done as an ordinary may do in such a case," (that is, has not exceeded his jurisdiction,) "then we ought to adjudge these good, or otherwise." According to what Mr. Jefferson calls Finch's interpretation, the judge decided that the sentence of the ecclesiastical tribunal when warranted by the holyscriptures, shall be credited in a common law court as the decision of a competent tribunal, provided the ecclesiastical tribunal did not exceed its jurisdiction. According to Mr. Jefferson's version the judge decided that the same sentence, when warranted by the "ancient written laws," should be so acknowledged and credited. What these written laws were, Mr. Jefferson does not inform us: but the common *Page 560 
law was emphatically the lex non scripta, or unwritten law as contra-distinguished from the statute law, and Mr. Jefferson probably knew that he must have intended either statutes of parliament or the written laws of the church. The statutes of parliament could not have been intended, for they did not regulate the ecclesiastical jurisdiction; and the words "car ceo est common ley sur que toutsmanner leys sont fondues," when applied to them would be nonsense. For how could they be said to be the foundation of all human laws. If by written laws, Mr. Jefferson meant the written laws of the church at that day, they, at that day, credited the holy scriptures and professed to be built upon them. The ecclesiastical tribunals, as we know from Caudrey's case, assumed jurisdiction of all offences purely against God and the holy scriptures pro salute animae, without reference to the mere effect of such offences on the peace of society, which the common law never did. But the common law judges by yielding up that jurisdiction to the ecclesiastical courts, refusing to reverse or to revise their decisions when incidentally or collaterally presented in a common law court, thus simply recognizing those decisions as ecclesiastical and not as common law, did no more intend by that to acknowledge the laws of holy church as common law, than they intended to acknowledge admiralty law as common law when they gave faith and credit to an admiralty decision. It is not within our knowledge that any common law judge has cited this case in the Year Book, or referred to it in any manner to prove his position in deciding a case of blasphemy that the malicious reviling of Christianity was punishable at common law. The labor with which Mr. Jefferson has searched the Year Book to convict Finch of a mistranslation would have been saved had he been aware that he was only proving by his own construction of the passage, that the ecclesiastical law was founded in the written laws of the church and not in the scriptures
alone. As friends of religious liberty, we would prefer that the common law should have "engulphed bible and testament," rather than the laws of the church as understood at that day, which not only professed to comprise the bible and testament, but usurped an entire control over the consciences of men; and pro salute animae issued their writde heretico comburendo, or burnt the body under pretext of saving the soul.
Having thus seen Mr. Jefferson's premises, let us next consider the argument built upon them to convict Mansfield of judicial forgery. He says that Hale decided that Christianity was parcel of the laws of England, but quoted no authority; that by such echoings and reechoings from one to another, in 1728 the court (composed of Lord C. J. Raymond; and Page, Reynolds and Probyn, justices,) in the case of TheKing vs. Woolston, for blasphemy, 2 Str. 834, would not *Page 561 
suffer it to be debated whether writing against Christianity in general,
was punishable in the temporal courts at common law; that justice Blackstone adopts Hale's opinion, and cites the adjudged cases; and finally, that Lord Mansfield had used the words before quoted, as delivered by him in Evans' case, "that the essential parts of revealed religion are parts of the common law:" thus, says Mr. Jefferson, engulphing bible, testament, and all into the common law, without citing any authority. "And thus far" he adds, "we find this chain of authorities hanging link by link one upon another, and all ultimatelyupon one and the same book, and that a mistranslation of the wordsauncient scripture used by Prisot." He concludes that he "might defy the best read lawyer to produce another scrip of authority for this judicial forgery." This letter writer then first admits expressly that neither Hale nor Mansfield had cited any authority for their opinions, and immediately after, charges the principles for which their great names are cited, with hanging upon what he calls a mistranslation of the words used by Prisot. He thought that his erudition had enabled him to detect the very source from which their ignorance and folly, or their knavery, had sprung. Had Hale and Mansfield quoted the passage from Prisot, which Mr. Jefferson has thus plumed himself upon the translation of, as the foundation for a, judicial opinion, then they would have been responsible for the translation of the passage, but neither of them quoted the Year Book; they had no occasion to quote any authority. Long before Lord Hale decided that Christianity was a part of the laws of England, the Court of Kings Bench, 34 Eliz. inRatcliff's case, 3 Coke Rep. 40, b. had gone so far as to declare, that "in almost all cases, the common law was grounded on the law of God, which it was said was causa causans," and the court cited the 27th chapter of Numbers, to show that their judgment on a common law principle in regard to the law of inheritance, was founded on God's revelation of that law to Moses. Mr. Hargrave, in his note onGo. Lit. 11, b. observes, that "This inference from God's precept to Moses is unwarranted, unless it can be shown that it was promulgated as a law for mankind in general, instead of being, like many other parts of the Mosaical law, a rule for the direction of the Jewish nation only." The author of the reports and the commentary on Littleton was a professor of Christianity, as is visible in all his writings. That Hale with such an authority before him should not have deemed it necessary to cite Coke, familiar as his writings were to the profession, at a time when his works were the principal text-book of every lawyer, cannot be the subject of much wonder; and we know, notwithstanding Mr. Jefferson's defiance, *Page 562 
that even Finch himself had quoted 8 II. 8, "Ley de Dieu est Ley de terre," the law of God is the law of the land, Doc. Stud.lib. 1, c. 6, Plowd. 265, to sustain his position that the holy scripture is of sovereign authority, and to show the extent and meaning of the maxim. But, independent of Lord Coke or any other judge, Sir Matthew Hale was an authority of himself, and is considered as a sufficient authority for a common law principle in every case when there is no contrary authority. What sources of legal knowledge his great erudition may have consulted on this subject, we have no means of certainly knowing, nor is it necessary to inquire.
As for the alledged translation of Finch, we have examined the whole passage, and are well satisfied that if Finch construed "auncientscripture" to mean holy scripture, such a translation of the Norman french would be the true translation. But in fact Finch has not ventured any translation of the passage whatever, notwithstanding Mr. Jefferson professes to copy the very words in which he has translated it. We speak with the work of Henry Finch, of Gray's Inn, Book 1st, chap. 3, published in London 1759, before us. Mr. Jefferson has made a translation for Finch in words with inverted commas, then attempted to prove his translation false, and failed to do it. Finch evidently believed that Prisot spoke of the holy scripture, and therefore, he cited the Year Book with other authorities to sustain a general position in the text, that the scriptures were of: sovereign authority; a position which, like that of every other compiler, was good to the full extent of his authorities and no further, and which is sustained by the Year Book so far as to show that the common law did recognize the decisions of ecclesiastical courts, which were founded on the scriptures, as conclusive when brought collaterally in questionin a common law court. Lord Mansfield's alledged judicial forgery stood, as the cases we have cited prove, upon other and many other authorities than Mr. Jefferson appears to have ever read.
It is true, that the maxim of the English law, "that Christianity is a part of the common law" may be liable to misconstruction, and has been misunderstood. It is a current phrase among the special pleaders, "that the almanac is a part of the law of the land." (Chit. PL 221, c.) By this it is meant, that the courts will judicially notice the days of the week, month and other things, properly belonging to an almanac, without pleading or proving them. In the same sense it is sometimes said that the lex parliamentaria is a part of the law of the land. So too, we apprehend, every court in a civilized country is bound to notice in the same way, what is the prevailing religion of the people. If in Delaware the people should *Page 563 
adopt the Jewish or Mahometan religion, as they have an unquestionable right to do if they prefer it, this court is bound to notice it as their religion, and to respect it accordingly. In England Christianity, notwithstanding the dicta of Mr. Jefferson and Major Cartwright, has been the prevailing religion of its people for a time beyond that of legal memory, if the best English historians are entitled to credit. While the ecclesiastical courts were often disgraced by all that bigotry could do, the common law in giving faith and credence to their decisions, did only acknowledge them as the sentences of a separateand independent jurisdiction, without assuming the responsibility of their judgments. It noticed the decrees founded on the laws of revealed religion as the laws of another tribunal, whose sole province it was to punish for a violation of those laws. It did not partake of the guilt; it did not share in the degradation of those who condemned a fellow man to human punishment for an alledged violation of the laws of God; unless an offence against man's peace and safety was embraced in it. It became the preserver of the peace and good order of society, throughout the land, and noticed what was the religion of the people, to the end that it might preserve that peace and good order. It sustained indictments for wantonly and maliciously blaspheming God, or the founder of the Christian religion, because such blasphemy tended to subvert the peace and good order which it was bound to protect. But it sustained no indictment for a mere sin against God as a common law offence, where these objects of its care were not affected. It did not look to the condition of man in another world to punish and thus prepare him for it in this. That was the loathsome duty of some ecclesiastical commissioner; some fiery bigot, or star chamber judge. While these punished blasphemy as a spiritual offence pro saluteanimæ, the common law only punished it when it tended to create a riot or break the peace in some other mode, or subvert the very foundation on which civil society rested. It took cognizance of, and gave faith and credit to the religion of Christ, as the religion of the common people; it acknowledged their right voluntarily to prefer that religion and to be protected in the enjoyment of it; and it carried that protection to the full length of punishing any man who outraged the feelings of the people and insulted civil society, by wantonly and maliciously reviling or ridiculing the religion which they had freely preferred, and upon which they had staked all their hopes of happiness both here and hereafter. The declarations of Lord Hale, Lord Raymond and others, who pronounced Christianity to be parcel of the common law, are all to be taken in reference to the cases of blasphemy before them; and for the purpose of punishing such blasphemies as they condemned, they noticed *Page 564 
that Christianity was the religion of England, and in this sense a part of the common law of the land. The dictum of Lord Mansfield expressly confines the maxim to the object of so noticing it — the punishment of the crime of insulting or subverting that on which the affections of the people were placed; and it has been considered as a fair inference from all the principles and decisions of the common law courts in England, that no author or preacher who fairly and conscientiously promulgates the opinions with whose truth he is impressed, for the benefit of others, is for so doing amenable as a criminal; that a malicious and mischievous intention is in such a case the broad boundary between right and wrong; and that if it can be collected from the offensive levity with which so serious a subject is treated, or from other circumstances, that the act of the party was malicious; then, since the law has no means of distinguishing between different degrees of evil tendency, if the matter published contain any such tendency, the publisher becomes amenable to justice." Stark, on Sland.
444, and authorities there cited.
Having thus seen that the offence charged in these indictments is within the common law definition of blasphemy, and therefore, within the purview of the statute of this state against that crime, the question whether that statute be inconsistent with the stateconstitution, now remains to be considered.
The first section of the first article of the constitution of Delaware, which has been the subject of much discussion both at home and abroad, is in these words: "Although it is the duty of all men frequently to assemble together for the public worship of the author of the universe, and piety and morality, on which the prosperity of communities depends are thereby promoted; yet no man shall or ought to be compelled to attend any religious worship, to contribute to the erection or support of any place of worship, or to the maintenance of any ministry against his own free will and consent; and no power shall or ought to be vested in or assumed by any magistrate that shall in any case interfere with, or in any manner control the rights of conscience in the free exercise of religious worship; nor a preference given bylaw to any religious societies, denominations, or modes of worship."
In connection with this subject the following sections have been quoted —
"Art. 1, sec. 2. No religious tests shall be required as a qualification to any office or public trust under this state.
Art. 8, sec. 9. The rights, privileges, immunities and estates of religious societies and corporate bodies shall remain as if the constitution of this state had not been altered. No Ordained clergyman, or *Page 565 
ordained preacher of the gospel of any denomination, shall be capable of holding any civil office in this state, or of being a member of either branch of the legislature while he continues in the exercise of the pastoral or clerical functions."
These passages are the same in the constitution of June 12, 1792, and the revised constitution of December 2, 1831, save that in the former the word "ordained," in sec. 9, art. 8, is omitted.
It clearly appears from the works of Campanius, Proud and other writers, as well as by the ancient laws and records of the colony, and the more recent laws and records of the state, that since the settlement of Delaware by the Swedes and Fins, which was one of the earliest settlements on this continent, down to the present day, Christianity has been that religion which the people as a body have constantly professed and preferred. The Swedes who were ever zealous Christians, were succeeded by the Dutch, who equally professed and practised the same religious faith; and the English, who afterwards took possession of the province, also professed the same belief in Jesus Christ, as the savior of man. About seventy years after the landing of the Swedes, and perhaps fifty years after the settlement of this ancient town, where we still meet for the administration of justice, William Penn, the first English proprietary and governor of this territory, signed that bond with our ancestors called the "charter of privileges." This deed, which bears date 13 William III, (October 28th 1701,) 1 Del. Laws, app. 37, while it professed "to secure perfect liberty of conscience to every person who should confess and acknowledge one Almighty God, the creator, upholder and ruler of the world, and profess himself obliged to live quietly under the civil government" ordained, that "all persons who also professed to believe in Jesus Christ, the savior of the world, shall be capable (notwithstanding their other persuasions and practices in point of conscience and religion) to serve this government in any capacityboth legislatively and executively, he or they solemnly promising when lawfully required, allegiance to the king as sovereign, and fidelity to the proprietary and governor, and taking the attests asnow established by the law made at New Castle in the year 1700, entitled "An act directing the attests of several officers and ministers as now amended and confirmed." So that while by his charter, liberty of conscience was thus far secured to all who professed to believe in a God, none but those who professed to believe in Jesus Christ, the savior of the world, could serve the government under this charter of William Penn, in any official capacity whatever.
Seventy-five years after the date of this charter, on the 11th September, 1776, the "declaration of rights and fundamental rules of *Page 566 
the Delaware State, (1 Del. Laws, app. 79,) was adopted, the second and third sections of which are in these words:
"Sec. 2. That all men have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences and understandings; and that no man ought or of right can be compelled to attend any religious worship, or maintain any ministry contrary to or against his own free will and consent, and that no authority can or ought to be vested in, or assumed by any power whatever that shall in any case interfere with, or in any manner control the right of conscience in the free exercise of religious worship.
Sec. 3. That all persons professing the Christian religion ought forever to enjoy equal rights and privileges in this state unless, under colour of religion, any man disturb the peace, the happiness or safety of society."
Thus we see that at the breaking out of that struggle for civil and religious liberty, in which the people of this state bore a part which was not less distinguished for bravery in the field and wisdom in councils than any of her sister states, equality of religious rights and privileges was still expressly restricted to persons professing theChristian religion.
On the 20th September, 1776, the first constitution of the Delaware State was adopted, the 22d article of which provided, that "every person who shall be chosen a member of either house, or appointed to any office or place of trust, before taking his seat or entering upon the execution of his office, shall take the following oath, or affirmation if conscientiously scrupulous of taking an oath, to wit: — "I A. B. will bear true allegiance to the Delaware State,submit to its constitution and laws, and do no act willingly, whereby the freedom thereof may be prejudiced:" and also make and subscribe the following declaration, to wit: — "I, A. B. do professfaith in God the father, and in Jesus Christ his only son, and in theHoly Ghost, one God blessed for evermore; and I do acknowledge the holyscriptures of the old and new testament to be given by divineinspiration."
The 25th article of this constitution provided that the common lawof England, as well as so much of the statute laws as have been heretofore adopted in practice in this state shall remain in force, unless they shall be altered by a future law of the legislature, such parts only excepted as are repugnant to the rights and privileges contained in the constitution and the declaration of rights, c,agreed to by this convention," 1 Del. Laws, app. 89.
The act of 13 Geo. 2, (1 Del. L. 174,) punished "wilful or premeditated blasphemy by setting the offender in the pillory for the space of two hours, branding in the forehead with the letter B, and public *Page 567 
whipping on the bare back with thirty-nine lashes, well laid on." By the same act swearing, in the hearing of a justice of the peace, was punishable by a fine. By an act of the 17 Geo. 2, to enable religious societies of protestants to purchase for burying grounds, churches, houses of worship, schools, c, the statutes of mortmain were partially repealed for the benefit of protestants alone. (Digest Del. L.
457-8.) This distinction between protestants and others made by this act, was not preserved in the subsequent act of 1787, (Dig. D. L. 459,) which extended the same and other benefits to, "each and every religious society or congregation of Christians of whatever sect, order, or denomination;" provided, "that such society should consist of at least fifteen families statedly assembling at one place of Worship, BEING SUPPORTERS OF THE GOSPEL IN SAID SOCIETY OR CONGREGATION. (Dig. D. L.
462.) And finally, by the act of 6th February, 1795, the performance of "any worldly employment, labour or business whatsoever upon the Lord's day, commonly called Sunday," and all Sabbath breaking, was made punishable by fine. (Dig. Del. L. 483.) The present statute against blasphemy was passed thirty-one years after this.
We hold these to be legal proofs of what has been and now is the religion preferred by the people of Delaware. And, independent of these and other evidence existing on the statute book of the state, we are bound to notice as judges acting under the authority of the people at all times, what is that religion which they have voluntarily preferred. We know, not only from the oaths that are administered by our authority to witnessses and jurors, but from that evidence to which every man may resort beyond these walls, that the religion of the people of Delaware is Christian.
The next step which we take in discussing this subject is, that the people have secured to them by their constitution and laws the full and perfect right of conscience, the right to prefer any religion they think proper, and the corresponding and correlative right to protection in the exercise of this and all other their religious principles.
The distinction is a sound one between a religion preferred by law, and a religion preferred by the people, without the coercion of law; between a legal establishment which the present constitution expressly forbids in the 1st article already quoted, and a religious creed freely chosen by the people for themselves, and for the full and perfect enjoyment of which, without interruption or disturbance, they may claim the protection of law guarantied to them by the constitution itself.
We hold, and have already said, that the people of Delaware have a full and perfect constitutional right to change their religion as often *Page 568 
as they see fit. They may to-morrow, if they think it right, profess Mahometanism or Judaism, or adopt any other religious creed they please; and so far from any court having power to punish them for such an exercise of right, all their judges are bound to notice their free choice and religious preference, and to protect them in the exercise of their right. Put the case, then, that they repudiate the religion of their fathers and adopt Judaism; and that their legislature in obedience to their wishes, ordains that to write or ridicule the Jewish creed shall be blasphemy, and punishable as blasphemy is now punished. On an indictment against any man for maliciously reviling Moses in public, in the language of this defendant, and publishing the Jewish religion as a villainous imposition, are we or are we not bound to sentence him according to the statute ? Suppose the people then abjure Judaism, adopt the koran, and profess the religion of Mahomet. If their legislature enact that to revile or ridicule the prophet shall be blasphemy, may we or may we not against him who shall go into their public places, and with a loud voice maliciously, or with a mere intent to revile and ridicule him, publish in their presence that Mahomet was "a bastard and his mother was a whore," denounce the penalties of their statute?
On what principle would this court, acting under a constitution which prohibits any preference by law to a religious denomination, punish in either of the above stated cases? Not on the ground that the offender was a non-conformist or a dissenter; not because he did not profess the same religion with the rest of the people. The constitution proclaims in language never to be mistaken, that no man is responsible to his fellow men for a mere spiritual offence. For the sin against his God, it leaves every man to heaven, and to the thorns in his own bosom. It stamps with the highest possible sanction of authority the great truth which Lord Brougham says has now gone forth to all the ends of the earth, that man shall no more render an account to man for his belief, over which he himself has no control. But in the cases supposed, does any man doubt that the offender would be guilty of an outrage on civil society, tending so directly to create a breach of the peace, that either Jews or Mahometans, especially in the absence of a law to punish him, would visit him with summary vengeance? The history of both these religions shows, that for less offences against society among either Jews or Mahometans, the cross or the bow string has often avenged the insult, and disgraced the human character, under the directions of an outraged mob.
The constitution provides that the existing laws of the land not inconsistent with it, shall remain in force until duly repealed; and it was intended by it to continue in force all the great principles of the *Page 569 
common law, which still retains its character of "the common preserver of the peace of the land," and punishes as public offences against man, acts tending to create a breach of the public peace, and to endanger the public safety. He who disinters the dead and exposes the corpse to the public gaze; he who appears naked in the streets of a populous town, as Sir Charles Sedley did in London; every one who outrages decency so far as to incite others to a breach of the peace, is indictable at common law, although his conduct actually should inflict personal violence upon no one. On this principle, indictments for malicious mischief are constantly sustained. In the case of ThePeople vs. Smith, (5 Cowen, 258,) it was held that acts injurious to private persons, which tend to excite violent resentment and thus produce a disturbance of the peace are indictable; and that on this ground an indictment lies for maliciously, wickedly and wilfullykilling a cow. To the same effect are the cases of TheCommonwealth vs. Leach, 1 Mass. 59; Com. vs. Taylor, 5 Binney, 277; and Com. vs. Teischer, 1 Ball. 355, where M'Kean, chief justice, observed that the poisoning of chickens had been indicted in Pennsylvania, on the same general rule. The principle on which a libel, or the sending a challenge to fight a duel is indictable, at common law is the same. The libel or the challenge does not break the peace: it only tends to produce that result. Can any man then, by merely making a religious theme the butt of his raillery and the object of his outrage, claim an immunity for conduct which would otherwise be indictable? Shall the mere circumstance that he has abused religion, and thus provoked a riot, be a shield to protect him from the consequences which would befall him if he had but equally outraged public feeling in some other way? If the people preferred the religion of Mahomet, must we under our constitution, in despite of all legislative enactment to the contrary, suffer a man to insult civil society and provoke a mob and a riot, by gibbetting the image of the prophet in view of the public, or burning the koran by the hands of the common hangman? If the religion of the Jews be known to us to be the religion of our people, does that constitution compel us, although the legislature command the contrary, to permit any man to provoke the vengeance of that people, by burning the prophets in effigy or maliciously stamping the pentateuch under foot in the presence of the multitude.
But this is not putting the case strongly. The Christian believes that his savior was conceived by the virgin Mary, and is the son of his creator. He also believes that to sin against the holy ghost is the unpardonable sin. He views the utterance of the words laid in *Page 570 
these indictments as infinitely more horrible and blasphemously wicked than a follower of Mahomet or Moses could think them when spoken of the founder of his faith. One believes these words are spoken of his God, and of the God of his fathers; the being before whom all the wisdom and virtue of his ancestors have bowed the knee in adoration for centuries which are gone; the others would believe that the same words, when spoken of the founders of their religion, were spoken of man only, though inspired. The danger to the public peace is, therefore, so much the greater in every such a case as that actually before us. If a man may blasphemously revile the founder of the religion which the people have preferred in Delaware by words, he may by acts also. Suppose then one should exhibit publicly over his own door, in view of the whole people of the city of Wilmington, the image of Him on the cross whom they believed to be their God; and, to show his contempt for their feelings and their God, should proceed to hang it and make a bonfire of it before their faces; suppose that to gratify his malice, he proceed to exhibit a naked figure which he shall call the mother of Christ, in the act of prostitution: can he shield himself by saying that he conscientiously believed Christ was a bastard and his mother was a prostitute, and that he had an honest intent to publish the fact to the world? The subject is too awful for further public discussion by this mode of illustration. But in the cases put, will any man say that the public vengeance would not probably break out in open acts of violence against the author of such insults, especially were it once understood that there exists no law to punish him? It would be in vain to expect that a populace enraged by such means could be restrained by being informed that the constitution protected him. That disgraceful law of the mob called "Lynch law" would, it is to be feared, be inflicted in despite of every effort to restrain them. The professing and devout Christian would indeed look on the scene more in sorrow than anger but his relatives and friends, who are not strictly professors of Christianity or members of any church or sect, and the great mass who have been educated in the Christian's belief, though not professing to act up to it, would probably do as outraged and insulted men have in all ages been accustomed to do. We do not mean that their conduct would be justifiable, but viewing men as they are and not as they should be, looking as we are bound to do, to the motives and feelings which practically regulate and control mankind, we say we cannot doubt that the public peace would be endangered. Every man can put this question home to himself for a fair solution. Let him ask himself whether, if the words contained in these indictments and found by these verdicts to have been published, were uttered by *Page 571 
any one in his house, and in presence of his family, he would not instantly resent the outrage by an order to leave his premises, and enforce that order if necessary by the strength of his own arm? The response of a great majority of the people of Delaware, without including the actually pious and professing Christians, would solve the true question upon which this defendant's cases depend.
But it may and will be objected by some (for the question has excited deep interest among the writers of the day) that this mode of considering the subject is open to the remark, that the law may forever change with the religion and customs of the people. Thus it may be said that the Christian himself may live to see the day when he shall not dare to proclaim publicly that the religion of Mahomet, or the impostures of Joe Smith, are the just topics of his ridicule and contempt. We answer that when that distant day shall arive (if come it must) in. which the people shall forsake the faith of their forefathers for such miserable delusions, no human power can restrain them from compelling every man who lives among them to respect their feelings. A new code of laws and a new constitution would at once spring into existence, if they found those under which we live did not protect them from such insults. But in that event, no man could justify himself under the present civil institutions of the state in endangering the public peace. He might feel himself impelled by a stern sense of religious duty, to brave public opinion and become a martyr for his zeal. All this he might do, and justify himself in his own opinion for it before God. So too that resistance to government which would be rebellion or treason in a court of law, may be patriotism and virtuein foro conscientice. He who forcibly resists a bad religion, is thus far like him who resists a bad government; if successful in his resistance, he may become a greater reformer of men or a hero; if unsuccessful, a martyr or a traitor. But a court of law is not merely the forum conscientia. When human justice is rightly administered according to our common law and our constitution, it refuses all jurisdiction over crimes against God, unless they are by necessary consequence crimes against civil society, and known and defined as such by the law of man. It assumes that for sin against our Creator, vengeance is his and he will repay. It adapts itself to the condition of man as he is. In the language of Lord Coke (Go. Lit. 97, b.) "by many successions of ages it hath been fined and refined by an infinite number of grave and learned men; and Lord Mansfield describes the common law as a pure stream, which as it runs, refines. So far from its being true that it cannot suit itself to the religion, the moral code and the ever varying condition of the people whenever they voluntarily prefer to change them, it tolerates *Page 572 
every change in either, prohibits no reformation; and keeping constantly in view that its great object is to preserve the public peace and good order of society, without dictating what religion will best sustain it, or prohibiting any reformation in religious matters, it tolerates under all circumstances, every attempt to change, which does not by some overt act endanger the public peace and safety. It is emphatically a law for the protection of religious liberty; and no law can be truly such which does not equally protect the public peace from insults and outrages upon public opinion, when freely established and known to be so, whether that opinion be for Christian or infidel, Jew or Turk. In the second volume of the Encyclopædia Americana, by Leiber, p. 130, it is remarked by a writer on blasphemy, "viewing this subject in a philosophical, religious, or political view, it would be difficult to lay down any general principles applicable to different states of society; but the prevailing opinion on this subject in the United States, and that to which the laws and opinions of other countries are strongly tending, is, that any one may profess or oppose any docrine, provided he inculcates his principles, whether orally or in writing, in such manner as not to commit a flagrant violation of decorum; what acts or words will constitute such an outrage mustevidently depend upon the state of society." If the violation of decorum here mentioned, be so flagrant as to endanger the peace of society, the principle of law thus limited and expressed is one, which had it been engrafted into the civil institutions of other countries, would have superseded the necessity of revolutionizing their governments with every change or reformation in religion; and rivers of blood which have been poured out in the conflicts of contending factions, might thus have been spared to mankind.
It will be seen then that in our judgment by the constitution and laws of Delaware, the Christian religion is a part of those laws, so far that blasphemy against it is punishable, while the people prefer it as their religion, and no longer. The moment they change it and adopt any other, as they may do, the new religion becomes in the same sense, a part of the law, for their courts are bound to yield it faith and credit, and respect it as their religion. Thus, while we punish the offence against society alone, we leave Christianity to fight her own battles, and so far we fully accord with the sentiments of a late writer, whose essay was cited at the bar, that "Christianity requires no aid from force or persecution; she asks not to be guarded by fines and forfeitures. She stands secure in the armour of truth and reason. She seeks not to establish her principles by political aid and legal enactments. She seeks mildly and peaceably to establish them in the hearts of the people." (Am. Quar. Review, *Page 573 No. 34, June, 1835, p. 338.) But we would reply to all who would reason as this writer has on the main question before us, that while Christianity requires no aid from force, the peace and order of civil society do require much aid from it to repel force and to prevent persecution; that while Christianity asks not to be guarded by fines and forfeitures, man has been compelled to make courts and prisons to guard him both by fines and forfeitures; that while Christianity stands secure in the armour of truth and reason, the public peace, which is altogether a different thing, has never stood secure in the armour of mere truth and reason, without the co-operating aid of some public punishment to assist them; that political and legal enactments are among the best means by which the peace has been preserved, in every country, and that while the law too, seeks mildly and peaceably to establish her precepts in the hearts of the people, yet if the people will the law to stand, it must be so administered as to compel obedience from such as do not yield it without force. The vice of this writer's essay is the common fault of the argument of those who have arrived at the same conclusion with him. He confounds the spiritual and temporal offence together, or rather fails to discriminate between the sin against God, which it would be presumptive arrogance and extreme folly to punish, and the offence against man alone, which in certain cases, necessarily grows out of his crime against the Deity. When the ecclesiastical court in England had jurisdiction of the former, the common law had it of the latter. But while the ecclesiastical courts punished blasphemy as an offence against God, their punishments superseded the necessity of any procedure at common law for the mere temporal offence. Blasphemy, when viewed as a spiritual offence, was enumerated by Coke in Caudrey's case, as an offence entirely within the jurisdiction of the ecclesiastical courts, and "not within the conisance of the common law courts." The petition of Carlisle, who was convicted of publishing Paine's "Age of Eeason," was presented to parliament in 1825, by Lord Brougham, and it betrays the same mistake of the true boundaries of the respective jurisdictions of the ecclesiastical and common law courts which this writer, who quotes that petition to enforce his own argument, every where exhibits. In fact, Carlisle actually quotes Lord Coke in Caudrey's case as an authority contrary to Hale, and says he was always considered as good an authority as Sir Matthew Hale. So indeed he was. But his report of Caudrey's case, no where clashes with what Hale afterwards said was the common law jurisdiction in cases of blasphemy. Lord Coke expressly says, that "in causes ecclesiastical and spiritual as blasphemy, heresies, c, the conisance whereof belongeth not to the *Page 574 
common law, the same are to be determined by the ecclesiastical judges;" and he adds, that the conisance of such causes (to wit, for the spiritual offence,) is not within the common law. But Lord Coke never said that blasphemy, considered as a temporal offence, was not within the conisance of the common law. After the decay of the ecclesiastical courts and the abolition of the star chamber, the common law jurisdiction was necessarily brought into active exercise. The Court of King's Bench became, as was then said, the custos morum, and the law which had slept, but was not dead, awoke to defend the good order of the nation with a vigor which was fully adequate to the real wants of society, and demonstrated that there was no necessity for the tyrannical powers of the ecclesiastical commissioner, or the infamous oppressions of the star chamber court.
We are aware that there is danger in the administration of any law which man ever yet laid down for the government of human action. On this subject there may be danger from both licentiousness and bigotry. We have endeavored to mark down the length, width, height and depth, of the only principle upon which, as we think, blasphemy can be punished under our state constitution. We again repeat, that the only legitimate end of the prosecution is to preserve the public peace. It is sometimes said that our courts are the conservators of morals. This is true just so far as a breach of morals may necessarily tend to a breach of the peace, and no further. We are not the custodes morum in any sense, except with this qualification. Yet nothing is more common, even in our American reporters, than judicial declarations that the object of certain common law punishments is to preserve good morals. We knowno other code of ethics which we can enforce than that which our lawsteach us, and we do not find, after sifting them as well as we may, that we can assume the power to punish any man for a breach of morals. Such a doctrine would lead us to usurp authority to punish for every sin against God as well as man. When the breach of morals is such an outrage on society as by fair legal intendment must lead to breach of the peace, as in Sedley's case, (1 Sid. 168,) or Eolle's case,(Sayer, 158,) or in the case of Sharpless, (2 Serg. Rawle 101,) or in this case and others of this character, we have no right to interfere one inch further than is necessary to prevent outrage and infractions of the peace in return for it. A man may say the horrible words set forth in this indictment in private, where he thinks no ear can hear him, and yet he is no more answerable to the law of man for that, than he who strips himself in his own chamber; for the wilful publication is the essence of his offence. A man may write a libel, no matter how blasphemous or seditions in its tendency; yet if it *Page 575 
sleep in his desk until dragged forth by the ministers of the law, it is not indictable, although it may be a great sin against God.
Franklin, though his name is cited as an unbeliever, in a letter to president Stiles in 1790, speaks of Christianity as the "best system of religion and morals the world ever saw or is like to see." (Franklin'sworks, vol. 6, p. 34, 241.) He thought it the best religion for the mere purposes of civil government. Concurring with him in this as we do, were we the conservators of morals, should we not be called upon by a sense of duty to punish every sin against the religion of Him whom we believe to be the son of God and the savior of man ? Yet nothing is more clear, than that our state constitution denies to us such an exercise of power as that of punishing any man for a mere difference of religion. This, indeed, is the just boast of those who made our constitution; who, as we know well, were educated in the Christian faith and believed in the Christian religion; that they gave religious liberty to every man who sets his foot upon the soil of Delaware; and never sought, as men of other religions have done, to make proselytes by coercion. Our ancestors had seen too much of oppression and intolerance under the penal statutes (not the common law) of England, to suffer those principles to take root among us, and their descendants have profited by their example. We say, therefore, that we cannot keep the consciences of men. And in general, we conclude, that mere impiety is never indictable unless the peace of society is endangered by it. In all cases where the tendency to excite to a breach of the peace is (as it must be in every indictment for blasphemy) the leading question; that is, a question for the jury as well as the court. Both must concur to find its tendency, for both are judges of the law.
But it has been said that it is dangerous to entrust any tribunal with power to judge of the mere tendency of acts or words, and that by this means a court and jury of fanatics and fiery bigots may finally decide, that every sin or mere impiety has a tendency to break the peace. We answer that this argument proves merely that this, like all other human power, may be abused. But to prove that power may be abused, is not to prove that power does not exist. The same kind of reasoning would break down every useful institution of man. We could no longer, according to this mode of demonstration, punish any libeller; because, in any case of libel the court must necessarily judge of the tendency and effect of the libellous words.
At the same time it is due to the subject to add, that there may undoubtedly be danger in many cases of indictment for blasphemy, of mistaking the tendency of the words when of doubtful effect. In such cases the common law furnishes the best possible security for *Page 576 
the accused in those great rules, that both jurors and judges are equally bound to decide the law, and that no man should be condemned if there be a rational doubt, in the minds of either judges or jurors, of his guilt. They are answerable both to God and their country for the justice of their decisions.
Let it not be supposed, that by laying down the rule that courts and juries are to judge of the tendency of words or overt acts amounting to blasphemy, we are establishing the rule, that they are to assume the power to judge the tendency of principles or systems of religion. On this subject we fully concur in the sentiments of Dr. Furneaux, in his letters to Mr. Justice Blackstone, (5 vol. Blac. Com. app'x. 34.) "With regard to the belief or disbelief of religious principles or religious systems, if the magistrate presumes to exercise his authorityas a judge, in such cases, with a view of restraining and punishing those who embrace and profess what he dislikes, or dislike and explode what he embraces, on account of the supposed ill tendency of their principles, he goes beyond his province, which is confined to those effects of such principles, that is, to those actions which affect the peace and good order of society; and every step he takes, he is in danger of trampling on the rights of conscience, and of invading the prerogative of the only arbiter of conscience, to whom alone men are accountable for professing or not professing religious sentiments and principles. For, if the magistrate be possessed of a power to restrain and punish any principles. relating to religion because of their tendency, and he be the judge of that tendency, as he must be, if he be vested with authority to punish on that account; religious liberty is entirely at an end; or, which is the same thing, is under the control, and at the mercy of the magistrate, according as he shall think the tenets in question affect the foundation of moral obligation, or are favorable or unfavorable to religion and morality. But if the line be drawn between mere religious principle and the tendency of it, on the one hand, and those overt acts which affect the public peace and order, on the other; and if the latter alone be assigned to the jurisdiction of the magistrate, as being guardian of the peace of society in this world, and the former as interfering, only with a future world, be referred to a man's own conscience, and to God, the only sovereign Lord of conscience; the boundaries between civil power and liberty, in religious matters, are clearly marked and determined; and the latter will not be wider or narrower, or just nothing at all, according to the magistrate's opinion of the good or bad tendency of principles."a *Page 577 
In the cases before us, we have the verdicts of two impartial juries to sustain us in the opinion, that the offences laid in these indictments are "against the peace of the state," and punishable as blasphemy by our state constitution. We have also the opinion of the Supreme Court of the State of New York, in Buggies' case, 8Johns. Rep. 225, which was fully considered, that under their constitution, which, after a comparison of it with our own, we find was intended to be as ample a guard for liberty of speech as ours, this identical offence was indictable as blasphemy at common law, and without the aid of any statute such as ours to specify blasphemy as a punishable crime.
The principles laid down in the year 1824, by the Supreme Court of Pennsylvania also, in the case of Updegraph vs. The Commonwealth, which was a trial for blasphemy under their statute, clearly establish that under their state constitution, the charge in these indictments is for an offence which they would not hesitate to punish as blasphemy. JudgeDuncan, delivering the opinion of the court in that case, said "even if Christianity was no part of the law of the land, it is the popularreligion of the country, an insult on which would be indictable, as directly tending to disturb the public peace;" and again, "it is the open, public vilification of the religion of the country that is punished, not to force conscience by punishment, but to preserve the *Page 578 peace of the country, by an outward respect to the religion of thecountry, and not as a restraint upon the liberty of conscience; butlicentiousness endangering the public peace, when tending to corrupt society, is considered as a breach of the peace, and punishable by indictment. 11 S. R. 399, 400-8.
It is no objection to the validity of these indictments that they describe the offence as done "to the dishonor of Almighty God, and in contempt of religion," though such charges indicate a spiritual offence. The intent to blaspheme God and the savior of- man are laid to show the malice of the offender, and in the first case both are found by the jury. But the gist of the misdemeanor is contained in the charge, that the words were published unlawfully and blasphemouslyagainst the peace. This charge after verdict, does "ex vi terminorum"
imply that the offence was committed wantonly and maliciously; for, without the malice, there can be no unlawful blasphemy. Whether expressly laid in such an indictment as this (which counts upon a statute and may follow its words,) or not, the malice or intent of the offender is always traversable as an essential part of the unlawful blasphemy. Thus, if another man was indicted for uttering these words, and the proof should be that he only uttered them in reply to a question what this charge was, without any intent to revile, but merely to satisfy the inquiry, it could not be pretended that the proof sustained the indictment for unlawful blasphemy.
The only question remaining to be considered is, whether judgment can be rendered by the rules of the common law on the verdict which does not find "the intent to blaspheme God."
This verdict convicts the defendant on the whole indictment "except as to the intent to blaspheme God." The question which arises is, whether it is necessary to prove the offence charged in the indictment to the whole extent laid. It is fully settled, that in criminal cases it is sufficient for the prosecutor to prove so much of the charge as constitutes an offence of the same grade punishable at law. (4B. C. 330, Bex vs. Hollingberry.) And an unnecessary averment may be rejected altogether, unless it be descriptive of the identity of that which is legally essential to the charge in the indictment. Without going at large into this distinction, the following cases are sufficient to decide the question before us. In Rex vs. Evans,
3 Stark. 35, where the prisoner was indicted for having published a libel of, and concerning certain magistrates, with intent to defame those magistrates, and also with intent to bring the administration of justice into contempt, Bailey, judge, informed the jury, that if they were of opinion that the defendant had published the libel with either of those intentions, they ought to find the prisoner guilty. InRex vs. Dawson, *Page 579 
3 Stark. Rep. 62, where the indictment charged the prisoner with having assaulted a female child, with intent to abuse and carnally to know her, and the jury found that the prisoner assaulted the child with intent to abuse her, but negatived the intention charged carnally to know her; Holroyd, J., held that the averment of the intention was divisible, and that the prisoner might be convicted of an assault with intent to abuse simply. And in the case of Rex vs. Hill, Russ. Ry.
190, upon an indictment for obtaining money under false pretences, it was held not necessary to prove that whole of the pretence charged: proof of part of the pretence, and that the money was obtained by such part was considered sufficient. These cases with those ofRex vs. Ellens, Russ. Ry. 183; Carson's case, Russ. Ry. 303; and Rex vs. Hunt, 2 Campb. 583; Rex vs. Williams, 2 Campbell,
646, fully establish the principle that such averments as those contained in this indictment, charging the intent to blaspheme God, and the intent to revile the Christian religion, are divisibleaverments; and either of these intents being found by the jury, is sufficient to sustain the indictment. The fair intendment from this verdict is, that the jury believed from the evidence, that the defendant was an infidel in creed. We cannot otherwise perceive how the rest of the indictment, which charges him with an intent to revile and blaspheme Christ and the Christian religion to the dishonor of Almighty God, could have been found by the jury as it has been, without also finding the intent to blaspheme God. At the trial the defendant urged that he was of opinion that the words used by him were true. The question raised by the verdict then is, whether one of his belief can claim an exemption from the penalty of the statute, when a believer in Christianity cannot. The law denies to his class as well as to every other, any right to blaspheme. If one class may thus do an act tending to a breach of the peace, all must have the same immunity from punishment, and the statute is a dead letter.
 Motion in arrest of judgment refused.
 The Court then proceeded to pass sentence on the defendant, to wit: in each case a fine of ten dollars, ten days' solitary confinement, and to find sureties of the peace himself in $200, and two sureties in $100 each, for one year after his discharge from imprisonment.
a Furneaux continues: "If it be objected, that when the tendency of principles is unfavorable to the peace and good order of society, as it may be, it is the magistrate's duty then, and for that reason, to restrain them by penal laws; I reply, that the tendency of principles, though it be unfavorable, is not prejudicial to society, till it issues in some overt acts against the public peace and order; and when it does, then the magistrate's authority to punish commences: that is, he may punish the overt acts, but not thetendency, which it not actually hurtful; and, therefore, his penal laws should be directed against overt acts only, which are detrimental to the peace and good order of society, let them spring from what principles they will; and not against principles, or the tendency of principles.
"The distinction between the tendency of principles, and the overt acts arising from them is, and cannot but be, observed in many cases of a civil nature, in order to determine the bounds of the magistrate's power, or at least to limit the exercise of it, in such cases. It would not be difficult to mention customs and manners, as well as principles, which have a tendency unfavorable to society; and which, nevertheless, cannot be restrained by penal laws, except with the total destruction of civil liberty. And here the magistrate must be contented with pointing his penal laws against the evil overt acts resulting from them. In the same manner he should act in regard to men's professing or rejecting, religious principles or systems. Punishing a man for thetendency of his principles, is punishing him before he is guilty, for fear he should be guilty."